JOHN V. GROSS, JR.,

               Plaintiff,

    v.

B. EDGE, et al.,

               Defendants.

OPINION and ORDER

Case No.  16-cv-588-wmc

*Pro se* plaintiff John V. Gross is proceeding in this civil lawsuit on claims that his medical care at the Wisconsin Secure Program Facility ("WSPF") violated his rights under the Eighth Amendment and state law.  Generally, Gross challenges defendants' response to his requests for a second mattress and ongoing back problems beginning in March of 2015.  The court initially granted Gross leave to proceed against thirteen defendants.  The Wisconsin Department of Justice represents twelve of those defendants because they are either Wisconsin Department of Corrections ("DOC") or University of Wisconsin employees, so the court refers to these defendants as the "State Defendants."  The thirteenth defendant is Tanya Bonson, a nurse practitioner employed by Maxim Health Care Services, Inc., and contracted to work at WSPF during the relevant time period.  Now before the court are the State Defendants' motion for partial summary judgment (dkt. #52), as well as defendant Bonson's separate motion for summary judgment on all claims alleged against her (dkt. #56).  For the following reasons, the court will grant both motions, leaving for trial only Gross's Eighth Amendment deliberate indifference and Wisconsin negligence claims against defendants Edge, Kramer, Anderson, Waterman and Wood.

## I.   Parties

Throughout the period comprising his claims, John Gross was incarcerated at WSPF and the majority of the defendants were DOC employees at that institution.  The State Defendants include:  Jolinda Waterman, the HSU Manager at WSPF; Dan Winkleski, WSPF's warden between September 20, 2015, and April 29, 2018, and member of the Special Needs Committee; Carrie Sutter, member of the Special Needs Committee; Brian Kool, member of the Special Needs Committee; Gary Boughton, WSPF's warden; Denise Stelpflug, a DOC Medical Program Assistance Associate ("MPAA") at WSPF; Lisa Hagensick, a limited-term WSPF employee who also worked as an MPAA during the relevant time period; and WSPF Nurses Edge, Kramer, Anderson and Wood.  The other State Defendant is Dr. Amgad Hanna, a Neurosurgeon for the University of Wisconsin Hospital and Clinics.  Finally, Gross is proceeding against Tanya Bonson, an Advanced Practice Nurse Practitioner ("APNP") or nurse practitioner.  Bonson was under contract with Maxim Health Care Services, Inc., during the relevant time period.  She worked at WSPF between May 31, 2016, and March 31, 2017, on a *locum tenens* assignment.

---

[1]  The following facts are material and undisputed unless otherwise noted.  The court has drawn these facts from the parties' proposed findings of fact and responses to those facts, as well as the underlying evidence, as needed.

## II.     Gross's March 2015 Surgery, Initial Post-Surgery Treatment and November 12 Injury

Besides his complaints about a double mattress restriction, Gross is proceeding against several defendants on claims stemming from problems he experienced for about eight months, after Dr. Hanna performed surgery on his back in March of 2015. Leading up to his surgery, Gross reported pain when sitting, standing or laying in one position for more than twenty minutes. Gross also reported numbness and pain across his lower back that radiated down his legs, as well as a "clicking" in his back.

When Gross reported these problems, health care staff sent Gross off-site for testing, imaging and other treatments, which included spinal cortisone shots. When those treatments proved ineffective, Gross was referred to the University of Wisconsin Neurology Department for evaluation, where Gross was diagnosed with spinal instability, or more specifically "Grade 1 spondylolisthesis, L5/S1, along with bilateral pars defect, and neuroforminal stenosis at that level bilaterally." To address this diagnosis, Dr. Hanna then performed surgery on March 30, 2015. Dr. Hanna specifically performed a right L5/S1 transforaminal lumbar interbody fusion and bilateral posterolateral instrumental fusion, meaning that a case filled with bone graft was inserted into Gross's spine to create a bony fusion between two vertebrae.

According to Dr. Hanna, he performed the surgery without complication. Gross recovered well from the surgery and was generally complication and pain free until November 12, 2015. Indeed, on April 1, 2015, Gross was discharged back to WSPF with wound care instructions and a physical therapy order. For three months following surgery, Gross saw a physical therapist approximately four times per month. The physical therapist

taught Gross how to exercise on his own. However, starting in May and June of 2015, Gross began complaining of feeling pops, muscle spasms and back pain.

On November 12, 2015, Gross suffered a back injury. Gross was completing a physical therapy exercise when he felt a "pop" near the surgical area. The next day Gross submitted a Health Services Request Form ("HSR"). He later described what happened during his deposition:

> I stopped, I was in mid-motion when it happened. My right knee buckled, I went down partially. So I stopped what I was doing, stood up, felt my back as I thought I was bleeding as it was still -- the wound was still healing. I didn't see any blood. I sat down for the remainder of maybe five or 10 minute. When I got back up I tested my legs and my back, made sure I could walk. I ended my rec, went back to my cell, wrote to HSU.

(Gross Dep. (dkt. #51) at 25-26.) At that point, Gross rated his pain as a 2 on a ten-point scale.

### III.    Gross's Post-Injury Treatment

Up to the time of his injury, Gross appears to have no real complaints with respect to his surgery or post-operative care. However, Gross complains about his post-injury treatment in at least three respects: (a) the scheduling of his follow-up appointments; (b) Dr. Hanna's treatment; and (c) NP Bonson's treatment.

### A.    Gross's Appointments

The HSU received Gross's Health Services Request regarding his back injury on November 13, 2015, and Nurse Beth Edge placed Gross on Dr. Burke's list of prisoners to see via telemedicine clinic on November 28, 2015. Gross submitted a second HSR dated

November 24, 2015, repeating his concerns about his back and asking to see a doctor. Nurse Anderson responded in writing the next day that Gross was on the list to see Dr. Burke, but that he should submit an HSR if he would like a nurse to see him before that appointment. (Ex. 100 (dkt. #61-2) at 186.)

Dr. Burke examined Gross on November 28, 2015, and Gross had a follow up appointment with Dr. Burke on December 18, 2015, with no further follow-up scheduled after that time. On January 4, 2016, HSU Manager Waterman responded to Gross's subsequent HSR's asking about his next appointment, writing that they were waiting to hear from UW. Gross submitted another HSR on January 17, and the next day Anderson informed Gross that his one-year post-surgery follow up appointment at UW had been scheduled for April 8, 2016. (*See* Ex. 100 (dkt. #61-2) at 215-16.)

Neither defendants Stelpflug nor Hagensick (the MPAA's) played any role in scheduling this appointment. In fact, the State Defendants explain that when a patient is referred for off-site specialty care, the provider writes an order and forwards a copy of the order to the MPAA. The MPAA then reviews the order and the appointment list to determine whether the prisoner is already scheduled for off-site care. If not, the MPAA contacts the specialty clinic to schedule an appointment. Neither the MPAA nor HSU staff determine the date of off-site visits; rather, off-site scheduling is determined by the specialty clinic.

In the meantime, Gross also had telemedicine visits with WSPF Nurse Practitioner Griffin on January 26 and February 16, 2016. At some point Griffin also referred Gross for an MRI of his back, which took place in Boscobel (a small community near WSPF) on

March 1, 2016. (Ex. 100 (dkt. #61-1) at 126.) The impressions from that MRI were of limited value due to the surgical changes, and while there appeared "to be progression of foraminal narrowing in the L5-S1 on the right," the degenerative changes were deemed mild. (*See* Bonson Decl. Ex. B (dkt. #60-2) at DOC 0807-808.)

## B. Dr. Hanna's Follow-up with Gross

On April 8, 2016, Gross had his one-year follow up visit with UW Neurosurgery, where he was examined by a nurse practitioner from Dr. Hanna's office and briefly met with Dr. Hanna himself. Gross reported his November 2015 injury and that he had a lumbar spine MRI scan completed at a medical facility local to WSPF. (Ex. 100 (dkt. #61-1) at 123-24.) According to Gross, he reported being unable to walk without pain or limping and asked for further testing and medication for his pain.

Dr. Hanna subsequently reported back to WSPF in a clinic note, writing that Gross appeared to be doing well, while relaying Gross's description of his November 2015 injury. Dr. Hanna opined that the popping sensation was likely not related to the surgery hardware, and instead that it could be musculoskeletal. For that reason, Dr. Hanna recommended Gross stay active and continue seeing a physical therapist for lumbar core stabilization exercises, but he also requested that the recent MRI scan be forwarded to him. (Ex. 102 (dkt. #62-1) at 6.) Dr. Hanna did not adjust Gross's medication regime, which at that point included pain relievers and a muscle relaxer.

Dr. Hanna had no subsequent in-person interactions with Gross, although they continued to have written communications about Gross's back problems, and Dr. Hanna continued to make recommendations until he ultimately referred him to other care

providers in 2017.  *First*, in a letter dated April 10, 2016, Gross wrote to UW Neurosurgery, asking Dr. Hanna for an order for personal shoes, a double mattress, an extra pillow and a rehabilitative band.  Dr. Hanna responded on May 3, 2016, writing that he would request that the HSU consider allowing him a second mattress, support pillow and rehabilitative elastic band.  (Ex. 102 (dkt. #62-1) at 31.)  Dr. Hanna also wrote that he reviewed Gross's April 8, 2016, x-ray, and March 1, 2016, MRI, and that both looked okay.   However, Hanna added that he was recommending a CT scan to look at the hardware and assess the fusion.  In his declaration, Dr. Hanna explains that when he wrote this letter, he did not consider extra mattress, pillow and band to be "medically necessary"; rather, they were "convenience and comfort" items.  (Hanna Decl. (dkt. #62) ¶ 24.)

*Second*, on May 31, 2016, Gross wrote to Dr. Hanna again, stating that another provider told him that he suffered a "re-injury," and that Dr. Hanna may have reviewed the wrong MRI.  On June 21, 2016, Dr. Hanna responded in a letter that he had been reviewed the correct MRI, repeated that it looked okay, and concluded by explaining that the prison declined to follow his recommendation for another CT.  (Ex. 102 (dkt. #62-1) at 5.)  Gross was next seen at UW-Neurology department by a nurse practitioner on May 11, 2017, for his two-year follow up.  The nurse practitioner noted that Gross was doing well, but that Gross reported spasms, particularly when he would lie on his right lower extremity, as well as numbness in his left leg.  (Ex. 1000 (dkt. #61-1) at 149-50.)  The nurse practitioner further wrote that Dr. Hanna would be reviewing his CT scan with any recommendation to be communicated back to DOC.

Gross then wrote a *third* letter to Dr. Hanna, dated June 25, 2017, complaining that: (1) he has been denied timely health care; (2) other providers thought Gross had reinjured his back; and (3) the prison was refusing to grant his request for an extra mattress. In response, Dr. Hanna reviewed all of Gross's imaging again, but still did not see any objective evidence to explain Gross's symptoms. In a letter dated July 19, 2017, therefore, Dr. Hanna responded that he was not recommending further spine surgery because there was no ongoing nerve compression, but that he would refer him for a spinal cord stimulator trial to treat his ongoing symptoms. (Ex. 102 (dkt. #62-1) at 1.) A spinal cord stimulator implant is a device placed surgically under the skin that sends a mild electronic current through the spinal cord. *See* Back Pain and Spinal Cord Stimulation, https://www.webmd.com/back-pain/guide/spinal-cord-stimulation (last visited Nov. 5, 2018). It is used to help patients with chronic back pain manage their symptoms, sometimes in situations in which prior back surgery has failed. *Id.* After Gross expressed interest in the implant, a nurse practitioner from Dr. Hanna's clinic coordinated with WSPF staff to arrange for the referral. (Ex. 102 (dkt. #62-1) at 46-48.)

Based on the referral, Gross was examined on February 9, 2018, for a spinal cord stimulator implantation. Specifically, Gross met with Dr. Ondoma, a resident under the supervision of Dr. Ahmed, another UW Neurosurgery doctor. Dr. Wendel Lake also evaluated Gross. According Gross, Dr. Ondoma explained that he would likely need surgery again. Also according to Gross, Dr. Ondoma did not criticize Dr. Hanna's prior surgery, but rather explained that his symptoms were consistent with joint/bone disease, and the "fake bone" that Dr. Hanna inserted during the November 2015 surgery did not

grow.  In contrast, Dr. Ondoma's February 9, 2018, progress notes indicate that Dr. Ondoma recommended the spinal cord stimulator, and there was no mention of corrective surgery.  Rather, Dr. Ondoma noted Gross's pain at the location of his spinal fusion (L5), and that Dr. Hanna, Dr. Lake and he decided they should rule out foraminal stenosis before proceeding with a spinal cord stimulator.  Accordingly, at that point, Ondoma ordered a CT scan, a "nerve bed stimulation shot," and x-rays.  He also wrote that Gross should return to the clinic four weeks after the scans and injection.  (Ex. 102 (dkt. #62-1) at 49.)

Gross underwent another CT on February 26, 2018, which showed an "L5 anterior subluxation with intact fixation."  (McCreary Decl. Ex. C (dkt. #59-3) at DOC 1128.)  In Dr. Hanna's opinion, the CT does *not* show any deformities or narrowing that could have been caused by the initial surgery, nor could be causing his current symptoms.  Gross submitted no medical records or statements from providers suggesting the contrary. According to Gross, he was supposed to have another appointment with UW-Neurosurgery following the CT, but no follow up was scheduled.  Gross adds that on June 21, 2018, he underwent a Lumbar Puncture/Myelogram at UW-Health Radiology, but has provided no details of the results.  (Ex. 21 (dkt. 73-1) at 54.)

C.    **Bonson's Treatment**

While still communicating with Dr. Hanna, Gross was also actively pursuing medical attention at WSPF, which is where defendant Bonson comes in.  On August 8, 2016, Nurse Practitioner Bonson examined Gross in the HSU for the first time, and they discussed Gross's history of back pain for about twenty minutes.  Bonson noted Gross's

complaint that he was having numbness and shooting pain in his right leg and foot, in addition to his back pain. (Bonson Ex. B (dkt. #60-2) at DOC 0738-39.) Bonson further observed that Gross's post-surgical status included a protrusion with numbness in the right lower extremity, and that she located the protrusion and physically palpated his back during the examination. Bonson also recommended a follow up CT scan because his surgery involved hardware placement and Gross was complaining about increased pain. Gross was hesitant, believing another CT scan to be unnecessary, but he ultimately agreed. When Bonson ordered the CT scan, she also prescribed Gross an anti-anxiety medication for Gross to take before and after the CT scan if needed. Bonson's impression was that Gross's condition was not an emergency, at least not on that day.

Gross again underwent CT scans in September of 2016, which again showed no postsurgical complication. While the scans did show a bulge at L3-L4, that condition had been present at the time of Gross's 2014 CT scan as well, at least in Bonson's view, and did not show a new injury or a re-injury. Similar to her previous impression, Bonson did not believe that Gross's CT results suggested the need for immediate care, but rather that Gross's already scheduled follow-up appointment was sufficient.

Bonson saw Gross again on September 23, 2016, this time for left knee pain. While Gross mentioned his back pain, Bonson did not take any action for it. Instead, Bonson wrote him a prescription of Cyclobenzaprine for his knee pain. The next day, Gross submitted an HSR to Bonson, asking why she was not taking any steps for immediate follow up about his back. More specifically, Gross wrote that Bonson had previously agreed with him that his L3-L4 bulge would likely lead to surgery, and he wanted to know why

she did not take action on that.  On September 25, 2016, Bonson responded in writing, explaining that she was willing to request he be seen at UW-Neurosurgery sooner than his next post-operative follow-up appointment (scheduled for May of 2017), but that her request was unlikely to change his next appointment time.  While Bonson avers that there is no record that Gross followed up with UW or anyone else, Gross claims that he did submit multiple requests to be seen, and, in any event, Bonson had not directed Gross to confirm in writing that he wanted to be seen sooner.

Between October of 2016 and March of 2017, Bonson treated Gross on several occasions for different ailments, including his back.  For example, on December 4, 2016, Gross asked for an adjustment in his medication because his current dosage was not helping his muscle spasms, whether in his lower back, right hip, right quad and right foot.  Bonson examined Gross for those complaints on December 12, 2016, and she diagnosed him with muscle spasms and sciatica, prescribing 5 mg Baclofen three times a day for three days, to be increased to 10 mg three times a day for three days.  Bonson also ordered a CT of his lumbar spine, pelvis and right leg to diagnose his back pain and muscle spasms, as well as an appointment after his CT with his UW neurosurgeon to discuss those issues.  Bonson deemed the new CT scan appropriate because Gross was reporting new symptoms, but still did not consider Gross's condition urgent enough for him to be seen off-site.

On December 27, 2016, Nurse Practitioner Bonson increased Gross's Baclofen for 14 days in response to his HSR asking for more pain relievers.  On January 3, 2017, Gross underwent an MRI for his left knee; and on January 12, 2017, he underwent the scans Bonson had ordered.  The pelvic CT showed postoperative changes related to the L5-S1

spinal fusion, and the lumbar spine CT showed a "bilateral pars defect," which in Bonson's opinion could cause pain and discomfort but did not indicate that Gross was suffering from a new injury or required immediate attention.  Rather, Bonson avers that even though this is a congenital condition that can ultimately result in a compression fracture, her impression at the time was that his condition did not indicate such a fracture.

On January 13, 2017, Bonson reviewed Gross's pelvic CT results with him, but did not yet have access to the results of the lumbar spine CT scan.  During that review, Bonson observed that Gross was still suffering from right lower extremity cramping and numbness, and she was unsure whether there was any improvement.  Having exhausted more conservative measures, Bonson also ordered electromyography ("EMG") testing to evaluate whether Gross's numbness and cramping in his hip, thigh, knee and calf, all of which could have been related to his back problems, were nerve-related.  Gross claims that this was an unnecessary and painful procedure.

On January 19, 2017, another nurse wrote to Gross about the results of his lumbar CT scan.  A few days later, Gross directed another HSR to Nurse Practitioner Bonson, also asking to speak with her about the results.  A different HSU nurse responded to that request.  On January 26, 2017, however, Bonson saw Gross again, this time for sinus pain. Bonson cannot recall whether Gross complained about back pain then or simply asked about the results of his most recent CT.  Regardless, Gross continued to submit HSR's about various issues that HSU staff handled.  By March of 2017, Gross also started asking about his EMG and neurosurgery follow-up appointments.  HSU staff responded that the appointments were scheduled.

On March 16, 2017, Gross underwent the EMG. The neurologist interpreting those tests results concluded that it was an abnormal study, with evidence of a mild and chronic right L5 radiculopathy (meaning that there was mild compression of or injury to a nerve root), but no evidence for neuropathy or myopathic disorder. (Ex. 102 (dkt. #62-1) at 16.) On March 23, 2017, Bonson ordered Gross a new type of muscle relaxant, and she assured him that his UW neurosurgeon appointment was scheduled. HSU Manager Waterman reviewed the results of the EMG with Gross on March 24, 2017, with Bonson's last day at WSPF on March 31, 2017.

In Nurse Practitioner Bonson's professional opinion, Gross suffers from spondylolisthesis (arthritis) in his back, and a conservative approach to his care seemed appropriate. Moreover, Bonson represents that Gross agreed to that approach to his care. Furthermore, Bonson avers that she had no control over scheduling off-site appointments, nor over forwarding relevant documents to off-site providers. Rather, WSPF employed a specific individual responsible for those tasks.

### D. Gross's Current Status

In August of 2018, Gross reached out to Drs. Ondoma and Ahmed, asking why he has not been seen for a follow-up appointment, but received no response from either doctor. Gross also reports continued pain in his lower back and through both legs, although his right leg is more painful. Unlike before surgery, Gross now also suffers from severe muscle spasms in his lower extremities and feet, and the "clicking" sound once limited to his back is now present in his hip, groin and lower back as well. Gross currently takes ibuprofen for his pain. Based on internet research that he and his family have performed

13

related to his symptoms, Gross believes that he suffers from "failed back surgery syndrome," or "pseudoarthrosis," meaning that the "bony fusion" that should have been formed during his surgery has failed. Gross insists that he needs a second, corrective surgery.

## V.     Warden Boughton's Involvement

While defendant Boughton has general supervisory care over WSPF as its warden, he does not supervise the day-to-day operation of its Health Services Unit, and he is not involved in hiring health care providers. Moreover, Boughton has no medical expertise. Accordingly, when a prisoner raises a medical issue with him, Boughton either refers the prisoner to the HSU or forwards their written correspondence to the HSU.

During the relevant time period, Boughton received one letter from Gross. It was dated September 25, 2016, and concerned a question about the cleanliness of WSPF, rather than Gross's health care. (Ex. 101 (dkt. #63-1).) In fact, Boughton's first notice of Gross's complaints about his medical care was after he filed this lawsuit. While Gross avers that he sent Boughton four letters with information relevant to this lawsuit, and that Boughton referred him to the HSU, Gross provided no copies of this correspondence. Finally, according to Warden Boughton, he was not involved in *any* of the medical care decisions related to Gross, nor was he involved in the Special Needs Committee's review of his request for a double mattress.

## VI.    Double Mattress Claim

Gross's last claim relates to his requests for a double mattress restriction. Like other DOC institutions, prisoners at WSPF seeking a medical restriction, or a finding of a special need based upon medical necessity, submit their requests to the Special Needs Committee. To constitute a medical necessity, there must be credible scientific evidence published in medical journals supporting the finding that there is a need to treat a specific medical condition. The warden appoints members of the Special Needs Committee, which is comprised of both HSU and security staff. It meets on a monthly basis to review special needs requests submitted by inmates. Mattress requests like Gross's fall under the purview of the Special Needs Committee.

### A.  Mattresses Available to DOC Prisoners

Before 2009, the DOC provided prisoners only 3-inch gray mattresses, so the Special Needs Committee handled requests for a second 3-inch gray mattress for comfort or medical necessity. In 2009, however, the DOC decided to start issuing institutions new 3-inch black, navy blue or white mattresses containing more wear-resistant material ("extra thick mattresses"). As a result, the DOC's Bureau of Health Services ("BHS") prohibited prisoners from doubling up on the thick mattresses because the quality of one extra thick mattress was on par with doubled up older mattresses. This change was memorialized in Appendix 1 of Policy #300.07 to state as follows:

> Double mattresses should not be used. Use thick mattresses only. Black or navy blue mattresses are considered thick mattresses. Double thick mattresses are not allowed.

Despite this change, the DOC did not get rid of all of the older, thinned-out mattresses. Rather, DOC policy provided that the Special Needs Committee may approve a "thick" mattress in very limited circumstances such as pregnancy, a severe disabling degenerative joint disease or for a temporary period of time post-surgery.[2] Moreover, in 2017, the DOC's Corrections Management Services Director determined that WSPF prisoners would no longer receive the higher qualify black or navy blue "thick" mattresses. During the relevant time period for Gross's claim, the upshot of these policies and changes on the availability of the mattresses is that the Special Needs Committee was responsible for determining mattress restrictions, and extra thick and double mattress restrictions appear to be interchangeable based on availability.

## B. Gross's Double Mattress Requests

Gross received Special Needs Committee approval for a double mattress on October 18, 2013. At that point, the committee members were Brian Kool, Mary Miller and A. Connelly. (Ex. 2-A (dkt. #1-1, at 3).) According to Gross, non-defendant Dr. Burton Cox had requested a double mattress for him to address his then-undiagnosed back pain. The State Defendants do not dispute that the committee approved Cox's recommendation, but their position is that it was approved for Gross's comfort, since there was no finding that Gross needed an extra mattress due to a medical necessity.

---

[2] While not relevant here, the Special Needs Committee could also approve specialized mattresses, but only upon a finding of a medical necessity.

After Gross's March 2015 surgery, he was issued a double mattress for recovery purposes. During Gross's October 7, 2015, appointment with Dr. Syed, Gross made two requests: (1) for his work restriction to be lifted, and (2) for a second mattress. Whether Gross had actually lost his second mattress is unclear, but Dr. Syed referred his mattress request to the Special Needs Committee. On November 20, 2015, the Special Needs Committee (comprised of defendants Winkleski, Waterman, Sutter, Kool and Anderson) denied Gross's request. According to Waterman, the request was denied because Gross had only been approved for either an extra thick mattress or double mattress through May of 2015 in order to help him recover after his March surgery, and that approval was not meant to be a long-term restriction. (Ex. 100 (dkt. #61-1) at 167.)

During Gross's appointment with Dr. Burke about a week later (November 28, 2015), they discussed his recent injury. As a result, Dr. Burke ordered an extra thick mattress for Gross for another six months. Unfortunately, a nurse recorded that restriction erroneously as "at WSPF," rather than "for six months." (Ex. 100 (dkt. #61-1) at 55, 168.) Regardless, the State Defendants' position is that this order did not comply with DOC policy requiring mattress restrictions to come through the Special Needs Committee.[3] Still, Gross admits he had a double mattress from 2013 through April of 2017.

[3] As previously mentioned, in May of 2016, Dr. Hanna also wrote a letter again requesting, among other items, a second mattress for Gross. After reviewing Dr. Hanna's request, Waterman actually wrote Gross on May 4, 2016, explaining that because Gross already had the thick mattress restriction, that he would not receiving a second mattress. (Ex. 100 (dkt. #61-2) at 171.) Nevertheless, it appears Gross still had the second mattress at this point.

At that time, Gross was moved into the Restrictive Housing Unit ("RHU") pending an investigation. Once moved, Gross was told that he would not receive a double mattress in the RHU, and that when he returned to the general population he could be given a newer, thick mattress. As a result, Gross alleges that he slept on a one-inch for three days in RHU, after which he was returned to general population. Gross then slept on a single gray mattress for about six months and three days. After he wrote numerous requests to the HSU for a thick or second mattress, Gross received a second mattress because there were no thick mattresses available. (Gross Dep. (dkt. #51) at 49-50.) This is despite the fact that a second mattress had not been formally approved by the Special Needs Committee. In fact, throughout 2017, Gross never even submitted a request for a double mattress. Nor could Gross remember sending any Special Needs Committee member any correspondence during that time, even though Gross submitted several HSRs requesting a double mattress during that same time period. And even though Gross does not have a current medical restriction allowing for a double mattress or an extra thick mattress, he currently has a second mattress.[4]

OPINION

I.      **Gross's Claims**

The court allowed plaintiff to proceed on Eighth Amendment and Wisconsin negligence claims against:

---

[4] The State Defendants acknowledge the incongruity here, explaining that Gross has likely kept an extra mattress from an available bed in the general population, and that no one has taken it away from him.

- Defendants B. Edge, B. Kramer, S. Anderson, Jolinda Waterman and L. Wood, WSPF nurses who were allegedly aware of his numerous complaints of pain, yet repeatedly failed to conduct any physical examination of him or offer additional treatment options.

- Warden Gary Boughton, who Gross claims was aware of, and at least partially responsible for, the inadequate medical system at the prison and how it resulted in denial of adequate care to inmates.

- Nurse Anderson and MPAA's Denise Stelpflug and Lisa Hagensick, who were responsible for scheduling off-site appointments. Gross alleges that even though Dr. Burke and Dr. Griffin ordered that he be seen by UW Neurology, these defendants failed to schedule any appointment, thus requiring him to wait in pain until his routine annual appointment occurred before seeing a specialist.

- Dr. Hanna, who Gross argues should have discovered that plaintiff had reinjured his back sooner, but failed to carefully review post-surgery x-ray and MRI results.

- Dr. Bonson, who Gross argues failed to prescribe any treatment or send plaintiff to a specialist at UW despite agreeing that plaintiff had likely reinjured his back.

- Special Needs Committee Members Waterman, Winkleski Carrie Sutter, and Brian Kool, who Gross claims denied his request for a second mattress as members of the Special Needs Committee, despite knowing that he needed the mattress to deal with his back pain.

Because Gross disputes the accuracy of contemporaneous notes generated by the defendant nurses Edge, Kramer, Anderson, Waterman and Wood regarding what symptoms he presented, the State Defendants concede that a trial will be necessary to resolve those claims. (State Def. Br. (dkt. #54) at 7 n.14.) However, the State Defendants seek summary judgment on the claims against Denise Stelpfleg, Lisa Hagensick, Bougton, Dr. Hanna and the Special Needs Committee members, which the court will grant for reasons set forth below. Defendant Bonson separately seeks judgment on the ground that no reasonable trier of fact could find that she acted with deliberate indifference or

negligence in handling Gross's medical needs. As explained below, the court will also grant that motion.

## II.    Eighth Amendment and Wisconsin Medical Negligence Claims

### A. Applicable Standards of Care

A prison official may be held liable under the Eighth Amendment if he or she was "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A condition does not have to be life threatening to be found "serious," but must at least: "significantly affect[] an individual's daily activities," *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); cause significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996); or otherwise subject the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825 (1994).

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment for a serious condition, but choose to disregard that need by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, but may require something less than *purposeful* acts. *Farmer*, 511 U.S. at 836. The point of division between the two standards lies where "the official knows of and disregards an excessive risk to inmate health or safety," or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and*

he both draws that inference and deliberately fails to take reasonable steps to avoid it. *Id.* at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."). A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). In *Petties,* the Seventh Circuit acknowledged the difficulty of applying this standard in the medical care context, outlining examples of conduct that could support a finding of deliberate indifference: when a doctor refuses to take instructions from a specialist; when a doctor fails to following an existing protocol; when a provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or where the treatment involved inexplicable delay lacking a penological interest. *Petties*, 836 F.3d at 729-31.

Wisconsin's standard for proving negligence is less rigorous. To prevail on his claim for medical negligence in Wisconsin, plaintiff must prove "only" that the defendants breached their duty of medical care and plaintiff suffered injury as a result. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865; *see also Gill v. Reed*, 381

F.3d 649, 658-59 (7th Cir. 2004). Wisconsin law defines medical negligence as "the failure of a medical professional to 'exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.'" *Williams v. Thorpe*, No. 08-cv-577, 2011 WL 4076085, at *7 (E.D. Wis. Sept. 13, 2011) (citing *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2s 423 (1999)). To establish a prima facie claim for medical negligence, a plaintiff must show that the provider failed to use the required degree of skill exercised by a reasonable provider, that he was harmed and that there is a causal connection between the provider's failure and his harm. *Id.* Expert testimony is required to establish the standard of care, unless "the situation is one in which common knowledge affords a basis for finding negligence." *Sheahan v. Suliene*, NO. 12-cv-433, 2014 WL 1233700, at *9 (W.D. Wis. Mar. 25, 2014).

## B. Defendant Boughton

Summary judgment in Warden Boughton's favor is appropriate because Gross has submitted insufficient evidence for a reasonable jury to find that he even knew about his medical care needs or mattress requests. "[A] defendant must have been 'personally responsible' for the deprivation of the right at the root of a § 1983 claim for that claim to succeed." *Backes v. Village of Peoria Heights, Ill.*, 662 F.3d 866, 869 (7th Cir. 2011). Since plaintiff has failed to adduce any evidence that would support a finding that Boughton knew plaintiff continued to complain about his back pain or his continued desire for a second mattress, he is entitled to judgment on this claim. *See also Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) (affirming summary judgment in defendants' favor where

the record failed to support a finding that they knew about his condition or requests for medical attention).

The court reaches this conclusion despite Gross's averments to the contrary. While Gross claims that he sent Boughton multiple letters on the subject, he is able to produce no copies of those letters, nor provided any details about when he sent the letters and what he actually reported to Boughton. Rather, the only record of a letter submitted to Boughton related to the cleanliness at WSPF, not his medical care. Moreover, there is no record of Gross following up when he failed to get a response. Without *any* evidence suggesting that Boughton personally received complaints from Gross about the health care he was receiving, it would be unreasonable to infer that Boughton actually learned about Gross's dissatisfaction with his medical care or mattress restriction. Finally, even if the jury could find that he received a health complaint, the undisputed evidence is that Boughton's normal practice was to refer it to HSU to address, since he lacked any medical expertise to do so.

Gross also argues that Boughton could be held accountable generally by virtue of his responsibility as WSPF's Warden to provide health care for all prisoners. Whatever merit there may be in this assertion on a different set of facts, it has no force here since there is no suggestion that Boughton had personal knowledge of Gross's claimed mistreatment. Moreover, even assuming that Boughton is ultimately responsible for the health care of the prisoners at WSPF, that responsibility is obviously from a management perspective, and does not preclude Boughton, as warden, from delegating the day-to-day operations of the HSU to the actual health care providers. *Burks v. Raemisch*, 555 F.3dd

592, 595 (7th Cir. 2009) (high level prison officials are "entitled to relegate to the prison's medical staff the provision of good medical care"). Not only that, Boughton, who is not a medical professional, is entitled to defer to the judgment of the medical professionals that treated Gross. Accordingly, the court concludes that judgment in Boughton's favor is appropriate, on both the Eighth Amendment deliberate indifference and the Wisconsin negligence claims.

### C. Defendants Denise Stelpflug and Lisa Hagensick

Summary judgment in Stelpflug's and Hagensick's favor is similarly appropriate. For one, Gross has proffered no basis to dispute the State Defendants' evidence that neither of these MPAA's was involved in scheduling Gross's appointments with outside care providers. Rather, Gross's main complaint about these two defendants is that they failed to ensure that outside care providers possessed all of his medical records for his appointments. Even assuming a misstep in this regard, Gross has offered no evidence that this materially altered the care an outside care provider was able to provide Gross at his appointments during the relevant time period. To be fair, following Gross's one-year follow up appointment in April of 2016, Dr. Hanna had to follow up with WSPF to ask for the results of Gross's March 1, 2016, MRI, but Dr. Hanna's ability to provide Gross the medical care he needed was not hampered by the absence of that one record, or at minimum there is no basis for a reasonable jury to find any material limitation in care. Indeed, the evidence is that Dr. Hanna subsequently received and reviewed the results of the MRI. As such, no reasonable trier of fact that either MPAA acted negligently, much

less with deliberate indifference, with respect to handling Gross's scheduling or his medical records.

### D. Defendant Hanna

Next, the State Defendants seek summary judgment in Dr. Hanna's favor because he handled Gross's medical care adequately and, for the most part, was not in a position to address any of Gross's complaints about his medical care. As an initial matter, Gross's allegations against Dr. Hanna's treatment do not relate to the 2015 surgery. Instead, Gross purports to challenge the manner in which Hanna responded to Gross's follow up requests and complaints about his treatment. In Gross's view, Hanna should have recognized that he would need corrective surgery or further testimony as early as January of 2017, but he failed to take steps to facilitate tests or a surgery. Of course, as an inmate, Gross has no constitutional right to select among reasonable treatment options, *Jackson v. Kotter*, 541 F.3d 688, 697-98 (7th Cir. 2008), and Gross has pointed to no evidence suggesting that Dr. Hanna's responses exhibited either negligence or deliberate indifference.

First, Gross complains that Dr. Hanna did not do more to facilitate his appointments at WSPF or to ensure that he receive the double mattress restriction he was seeking. Certainly, Hanna had an obligation to provide follow up care to Gross following the 2015 surgery, which the court addresses in greater detail below, but as an outside consulting physician, Hanna had no discernable obligation to press WSPF staff to follow his recommendation or to see Gross on a more frequent basis. If anything, this was the responsibility of WSPF's HSU. Absent extraordinary circumstances not even suggested here, Dr. Hanna cannot be held liable for deliberate indifference in failing to do another

person's job.  *See Aguilar v. Gaston*-Camara, 861 F.3d 626, 633 (7th Cir. 2017) (citing *Burks*, 555 F.3d at 595).

Gross's more developed challenge to Dr. Hanna's treatment is that he repeatedly misread Gross's subsequent scans, recognizing neither that his surgery had failed nor the need for corrective surgery.  While Gross insists that various care providers told him that corrective surgery would be necessary, the problem with this argument is that the record contains no suggestion that Dr. Hanna abandoned his professional judgment, was responsible for an unjustifiable delay in treating him, followed an easier course of treatment without using professional judgment or persisted in ineffective treatment.  Instead, the undisputed facts show that Gross had no complaints for some time after the April 2016 surgery.  In May and June of 2016, Dr. Hanna not only reviewed Gross's MRI and concluded that it looked okay, but he also asked that WSPF permit Gross to undergo a CT scan and receive a few comfort items, including an extra pillow and mattress.  At his one-year checkup, Dr. Hanna had no reason to change Gross's prescription of a muscle relaxer and pain medication, although he recommended that Gross continue seeing a physical therapist for stabilization exercises.  While Gross maintains that he presented at his April appointment in pan, no evidence of record suggest that Gross's condition required further treatment or an increase in his medications at that point.

After Gross reached out to Dr. Hanna again in June of 2017 following his second follow-up appointment, he repeated his desire for a double mattress expressed at his one-year checkup, but added a complaint that other health care providers thought Gross reinjured his back.  In response, Dr. Hanna again reviewed Gross's imaging and records

from the May 2017 follow-up appointment, but also looked at his EMG results. While Hanna still did not believe that corrective surgery was appropriate, he did not simply shrug off Gross's symptoms and those tests. Instead, Hanna decided a more aggressive approach to pain management was appropriate, an option Gross was willing to pursue. Indeed, Gross was examined for a spinal cord stimulator implantation in February of 2018. While the records of that visit do not indicate the next steps, nothing in those records support an inference that Dr. Hanna viewed Gross as a candidate for corrective surgery.

Most recently, Gross submitted records showing that he underwent further testing for his back. While Gross asserts that this testing revealed that Dr. Hanna missed the fact that he is suffering from "failed back surgery syndrome," and should have recommended further testing, none of the medical records that Gross submitted confirm his assertion. Rather Gross grounds this unsubstantiated diagnosis on internet searches that his family and he have conducted. Aside from this hearsay being an insufficient basis for a reasonable jury to find this to be a reasonable diagnosis, *cf. Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015) (accepting courts' limited use of "highly reputable medical websites" to fill in necessary information about medical condition or treatment), the only medical evidence contradicts it: even though Gross reported his concerns and possible diagnosis to other care providers, *none* of the records suggest that those providers agreed. Further, none of these care providers have recommended corrective surgery; rather, they agreed with Dr. Hanna's recommendations.

Ultimately, Gross submitted no evidence that Dr. Hanna failed to exercise professional judgment in declining to recommend corrective surgery or further testing

sooner, nor that his ongoing recommendations to WSPF regarding Gross's treatment somehow breached a duty of care. On the contrary, the evidence submitted at summary judgment by both the State Defendants *and Gross* appear to compel a finding that a team of medical providers, including Dr. Hanna, have consistently made recommendations and run a number of tests to ferret out and treat Gross's chronic back pain. Gross himself acknowledges continuing prescriptions for ibuprofen and ongoing access to physical therapy and muscle relaxers. At minimum, this record simply does not permit a reasonable trier of fact to conclude that Dr. Hanna was deliberately indifferent. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor not deliberately indifferent where he offered multiple tests, order consultation with a specialist and had no control over delays). Furthermore, given that Gross has no evidence suggesting that Dr. Hanna failed to meet the requisite standard of care, a reasonable trier of fact could not find him negligent as to Gross's surgery or post-operative care.

### E. Defendant Bonson

Summary judgment in Nurse Practitioner Bonson's favor is equally appropriate. Bonson was constistently involved in Gross's care for about seven months between August of 2016 and March of 2017. During this time, Gross generally claims that Bonson failed to respond appropriately to his ongoing reports of back pain, muscle spasms and a protrusion near the surgical area, but the record of Bonson's actual care belies that assertion. *See Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018); *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when

determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs.").

When Bonson first started treating Gross in August of 2016, she promptly ordered CT scans. Gross complains that these scans were unnecessary because he had already had an MRI in March of 2016, also after his post-operative injury in November of 2015, when Gross presented to Bonson reporting an increase in pain. However, the record shows Bonson had good reason to think the additional scans appropriate. Indeed, scans were appropriate to check Gross's hardware placement. Dr. Hanna had *recommended* additional CT scans at his May 2016 appointment with Gross to check the position of his hardware, but at that point in time WSPF staff declined to follow that recommendation.

Gross further complains about Bonson's decision in September 2016 not to attempt to hasten his UW-Neurology appointment. While Gross did not explicitly confirm with Bonson that he wanted her to reach out to UW-Neurology to move up his next appointment, once could reasonably to infer that he had made his desire clear to Bonson. Nevertheless, Bonson's decision not to act on this judgment call in no way supports a finding of deliberate indifference or negligence. For one, no evidence suggests that as a nurse practitioner Bonson at WSPF would even have been able to change his appointment time with UW. Certainly, had Gross been requesting to be seen sooner by a WSPF medical care professional, Bonson was in a position to make that happen, or at least she might be obliged to try to do so. Moreover, in the fall of 2016, Gross was not reporting symptoms that would justify an earlier appointment at UW. Instead, Bonson had just reviewed the

results of Gross's September CT scans, finding that his hardware was still in place, an assessment that Dr. Hanna later confirmed in 2017, when he reviewed Gross's CT scan.

Even if Bonson could somehow be charged with delaying Gross's further treatment, he must also prove that "the delay in treatment 'exacerbated the injury or unnecessarily prolonged pain.'" *Wilson*, 901 F.3d at 822 (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997), in support of holding a three and a half month delay in treatment did not support a finding of deliberate indifference). Here, the record confirms that Gross continued to receive his normal regiment of pain medication, with access to exercise and physical therapy. In contrast, the evidence of record does not support a finding that Gross's condition worsened because he was seen at UW as originally scheduled. Further, while Gross did continue to complain about pain and back spasms, the evidence of record does not suggest that Bonson intentionally persisted in treatment that she had reason to know would be ineffective. *See Gonzales v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (physicians are "obligated not to persist in ineffective treatment"). On December 12, 2016, Bonson diagnosed Gross with sciatica and prescribed additional muscle relaxers, as well as ordered another CT scan. Later in December, she increased his muscle relaxers. Then, in January, Bonson took a different approach by ordering the EMG testing to try to determine the nature of his lower right cramping and numbness that was seemingly not improving. Finally, in March of 2017, Bonson prescribed a different type of muscle relaxer in yet another apparent effort to help alleviate Gross's discomfort. Throughout this time frame, Bonson also continued to recommend exercise and physical therapy, something Gross never resisted nor was ever viewed to be contra-indicated. In reviewing the totality

of Bonson's care during her time at WSPF, she took various approaches to both finding the cause of, and attempting to alleviate, Gross's pain. None of that conduct supports a finding of negligence, much less deliberate indifference.

Gross next asserts that Bonson forced him to undergo unnecessary and painful procedures, but the record also fails to support that conclusion. For one, Gross claims that Bonson forced him to undergo CT scans after their August 2016 appointment. While the evidence of record suggests that Gross may have been uncomfortable with going forward with additional scans, Gross does not aver that he actually declined Bonson's suggestion of scans, only that he *agreed* to it in the hopes of getting back to UW for surgery. Even accepting that Bonson was requiring him to undergo this procedure, the record shows she made an effort to alleviate Gross's discomfort by prescribing him anti-anxiety medication. This evidence -- in which Bonson wanted to eliminate the possibility that his hardware had failed since March -- does not suggest that she breached any duty of care, much less that she abandoned her professional judgment altogether by ordering the CT scan.

Gross would similarly challenge Bonson's decision to order the EMG procedure in January of 2017, which he describes as painful. Again, Gross has not averred that he refused to undergo the procedure, only that it was painful. In fact, Gross's March 2017 inquiries into when the EMG would take place indicates an interest in pursuing the procedure. And even assuming that the EMG was actually painful, Bonson explains that this procedure was a reasonable option because she thought it would may reveal that the cause of his lower extremity cramping and numbness. Dr. Hanna found the EMG results useful in recommending the spinal cord stimulator. (*See* Ex. 102 (dkt. #62-1) at 1.)

Ultimately, since the evidence of record shows that Bonson's decisions were grounded in professional judgment (and affirmed by other care providers), and Gross has been unable to show that Bonson broke from a standard of care in a way that caused him injury, the court will grant Bonson's motion as well.

### F. Special Needs Committee Members

Finally, summary judgment in favor of defendants Waterman, Winkleski, Sutter and Kool, is also appropriate. Gross claims that these Special Needs Committee members were responsible for wrongfully denying Gross's request for a double mattress restriction. While Gross testified in his deposition that he actually had a second mattress for the majority of the relevant time period -- the exception being a six-month and three day period of time in 2017 -- it appears that he wanted the restriction to be approved and part of his record going forward, perhaps to ensure that he would receive double mattress as a matter of policy, rather than just as a courtesy. Either way, the Special Needs Committee members' undisputed handling of his requests require entry of judgment in their favor.

Between 2015 and 2017, the Special Needs Committee defendants became involved in Gross's efforts to obtain a second mattress restriction on only two occasions. The first was after Gross's October 2015 request (through Dr. Syed) for a second mattress, which was referred to the Special Needs Committee. Again, it is unclear whether Gross still had the second mattress that he had received after his March 2015 surgery. Even assuming that Gross had only one gray mattress at that point, however, the committee's November 20 denial was reasonable. On that occasion, the committee reviewed Gross's

request and denied it for two reasons: (1) Gross had already been allowed an extra mattress through May of 2015 because he was recovering from his March surgery; and (2) Gross had reported to Dr. Syed that he wanted his "no-work restriction" lifted at that point.

Even though Gross had submitted an HSR complaining about a "pop" on November 13, 2015, no evidence of record suggests that any of these defendants *knew* that Gross had reported further injury. Furthermore, Gross's physical condition at that time would not have qualified him for a special mattress or even an extra thick mattress: he was no longer considered post-operative, nor had he been diagnosed with a severe degenerative joint disease. While Gross directs the court to the 2013 decision by Dr. Cox and the Special Needs Committee to allow him a double mattress, that evidence is problematic for him at best. By Gross's own admission, he had not been diagnosed with any specific back condition at that time, nor was he post-surgery. Since no evidence of record would appear to support a finding that the Special Needs Committee made the 2013 decision based on a medical necessity, the only reasonable conclusion is that Gross received the second mattress for his comfort or because of a simple error (clerical or otherwise). While Gross may well have *believed* that the double mattress restriction was "permanent," the DOC reviews medical restrictions on a periodic basis and there is no record of a formal approval on the basis of medical necessity, much less a permanent one.

Gross also appears to challenge Waterman's May 2016 denial of Dr. Hanna's request to permit Gross to have a second mattress, among other items.[5] However,

---

[5] Waterman did not pass this correspondence on to the Special Needs Committee; rather, it appears that she wrote this letter to Gross in her capacity as the HSU Manager at the time.

Waterman responded in writing by recognizing that he had a restriction for an extra thick mattress, and confirming that she would ensure that he actually received it. (Ex. 100 (dkt. #60-2) at 171.) Waterman further wrote that he could not have a second, extra thick mattress because DOC policy did not allow it. Even if mistaken in practice, this response does not support a reasonable finding of deliberate indifference or negligence. For one, even if the extra mattress (on top of an extra thick mattress) would have been *better* for Gross, the Eighth Amendment does not require prison officials to provide flawless or the best treatment available. *See Knight v. Wiseman*, 590 F.3d 458, 467 (7th Cir. 2009) (citing *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004)). For another, Dr. Hanna's declaration is quite clear in opining that an extra mattress was *not* medically necessary for Gross; rather, the items were for Gross's convenience and comfort. In other words, Dr. Hanna's letter was simply *recommending* that WSPF consider providing an additional mattress to Gross, *not* prescribing one to him on medical grounds. Accordingly, given that Waterman's decision was based on her perception that Gross had adequate bedding, a reasonable jury could not conclude that Waterman's finding that Gross's mattress was adequate exhibited abandonment of her professional judgment or breach of a duty of care.

## III.    Remaining Issues for Trial

Since the court will grant the pending motions for summary judgment on all other claims, the only remaining claims for trial are plaintiff Gross's claims against defendants Edge, Kramer, Anderson, Waterman and Wood for their alleged failure to properly handle his complaints to the HSU. In particular, Gross claims that these defendants did not

respond to his requests for care and also inaccurately recorded his symptoms during the time period when he was filing HSRs and seen in the HSU for back pain.

While Gross filed no stand-alone motion, in his opposition materials to defendants motions, plaintiff does now request that the court appoint him counsel. His reasons for seeking counsel are that: (1) he has been unable to gather evidence necessary to prove his claims; and (2) he has been unable to secure an expert in support of his claim. This court previously denied Gross's requests for assistance in recruiting counsel because he had been able to meet the demands of the lawsuit at that time. (Dkt. #71.) Gross's summary judgment filings have proven that, while his resources may be limited by incarceration, the legal complexities of this case do not exceed his abilities. Indeed, Gross is an experienced litigator in this court, and his filings in this lawsuit confirm his familiarity with the Eighth Amendment deliberate indifference and Wisconsin common law negligence standards. Furthermore, the court has been impressed with the evidence Gross has been able to gather in opposition to the motions for summary judgment. Gross also used family members to both research the nature of his back condition, as well as to reach out to potential experts and the UW physicians that examined him most recently. While Gross was unable to actually secure a medical expert to provide evidence in support of his belief that Dr. Hanna missed something in his records, he has submitted the records of his after-visit summaries, which the court has found particularly helpful in determining that Gross was unable to create a question of fact by introducing evidence of other medical professionals who disagreed with Dr. Hanna's treatment decisions. Additionally, Gross submitted his own

medical records from within WSPF, and cited to them specifically in his materials, which has provided necessary context.

At trial, Gross's task will not be as difficult: he will be required to submit admissible evidence about the symptoms he reported to the nurses, for comparison with what is in his medical records. The jury will be tasked with making credibility determinations, either finding Gross credible in asserting that his medical records were altered with deliberate indifference or finding the defendants who recorded these entries contemporaneously to be more credible. To assist Gross with preparing for the logistical challenges of the trial, the court will be issuing a Trial Preparation Order, which will provide an overview of the trial procedures, outline the relevant rules of evidence and procedure and set out all pretrial deadlines. Furthermore, the court will be scheduling a telephonic pretrial hearing with the parties, during which Gross will be given the opportunity to ask any final logistical or legal questions before he proceeds to trial. Without underestimating the challenges any trial presents, the court is confident that if Gross uses the resources available, in addition to those his family may provide, he will be adequately equipped to proceed to trial *pro se*, particularly since the remaining claims will likely come down to a swearing contest between the two sides.

Finally, in light of these rulings, the court is denying defendants' joint motion to stay or amend the preliminary pretrial conference order (dkt. #83).

## ORDER

IT IS ORDERED that:

1. Defendants' motion for partial summary judgment (dkt. #52) is GRANTED.

2.  Defendant Tanya Bonson's motion for summary judgment (dkt. #56) is GRANTED.

3.  A final telephonic hearing will be held on November 20, 2018, at 3:00 p.m. Counsel for the State Defendants is responsible for initiating the call.

4.  The joint motion to stay or amend (dkt. #83) is DENIED.

Entered this 8th day of November, 2018.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge